# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CYNTHIA CLEVELAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:15-cv-01538-JEO |
| | ) | |
| JEFFERSON COUNTY BOARD OF EDUCATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this action, Cynthia Cleveland ("Plaintiff") brings claims against her former employer, the Jefferson County, Alabama, Board of Education (the "Board"), alleging violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq*., and Alabama state law.  (Doc.[1] 11-1 ("Amended Complaint" or "Amd. Compl.")[2]).  The cause now comes to be heard

---

[1]References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the CM/ECF system.  Pinpoint citations to deposition testimony are to the page of the transcript.  Unless otherwise noted, pinpoint citations are to the page of the electronically filed document, which may not correspond to the pagination on the original "hard copy."

[2]Plaintiff initiated this action by filing a complaint in Alabama state court on August 6, 2015.  (Doc. 1-1 at 1-6).  After the Board removed the action to this court (Doc. 1), Plaintiff filed a motion for leave to amend (Doc. 11), to which she attached a proposed amended complaint.  (Doc. 11-1).  The court granted that motion for leave.  (Doc. 12).  And although Plaintiff did not thereafter separately file an amended pleading, the Board filed an answer that treats the proposed amended complaint attached to the motion for leave as if it had been filed.  (Doc. 13).  Thus, the court will likewise treat Document 11-1 as a properly filed amended complaint.

on two related motions filed by the Board.  One seeks summary judgment under

FED. R. CIV. P. 56.  (Doc. 14).  The other motion requests that the court strike or

otherwise decline to consider the respective declarations of Plaintiff and another

witness, both filed by Plaintiff in opposition to summary judgment.  (Doc. 22).

Upon consideration, the court[3] concludes that the Board's motion for summary

judgment is due to be granted and that its motion to strike is moot.

## I.      SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, party is

authorized to move for summary judgment on all or part of a claim or defense

asserted either by or against the movant.  Under that rule, the "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  FED. R.

CIV. PROC. 56(a).  The party moving for summary judgment "always bears the

initial responsibility of informing the district court of the basis for its motion,"

relying on submissions "which it believes demonstrate the absence of a genuine

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see*

*also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v.*

---

[3]This case is assigned to the undersigned United States magistrate judge pursuant to 28 U.S.C. §
636 and the court's general order of reference dated January 1, 2015.  The parties have consented
to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc.
5).

*S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. PROC. 56(c)(1)(A), (B).  In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.     BACKGROUND[4]

Plaintiff began working for the Board in 1995, as an Attendance Clerk at Minor Community School.  During the period relevant to her claims, she was still

---

[4]The summary in this section is taken from the court's review of the pleadings and the record evidence submitted by the parties.  Consistent with the court's obligation at summary judgment, the record is viewed in the light favorable to Plaintiff.  Accordingly, these are the "facts" only for purposes of the Board's instant motion; they may not be the actual facts.

employed at that school but as its Office Coordinator.  While assisting in the school lunchroom on the morning of August 8, 2014, Plaintiff slipped on some milk and fell, breaking her kneecap in three places.  That injury ended up requiring two surgeries, one in August 2014 and another the next month.

It is undisputed that, following the accident, Plaintiff ultimately never resumed her work duties.  Rather, she requested and was immediately granted paid medical leave under the Board's written policy authorizing such leave for up to 90 days for an on-the-job injury.  (*See* Doc. 16-1, Deposition of Plaintiff Cynthia Cleveland ("Pl. Dep.") at 72-73; Doc. 16-2 at 8-9; Doc. 16-3 at 17, 38; Doc. 16-5 at 1-2, Affidavit of Craig Pouncey ("Pouncey Aff.") ¶ 3; Doc. 16-5 at 7).  The Board also has a written policy authorizing leave under the FMLA (Pouncey Aff. ¶ 2; Doc. 16-5 at 3-6), a federal law requiring qualifying employers to provide eligible employees up to 12 weeks of unpaid leave for, among other things, "a serious health condition that makes the employee unable to perform the functions of [his or her] position."  28 U.S.C. § 2612(a)(1)(D).  Under the Board's policies, however, an employee must utilize available paid leave before taking unpaid FMLA leave, and any such paid leave she takes runs concurrently with, and counts against, her 12-week allotment of, unpaid leave under the FMLA.  (Doc. 16-5 at 5, § 5.11.7).

On August 18, 2014, Becky Scott, an employee in the Board's Finance Department, sent an email to Katina Cephus, the Principal of Minor Community School, and copied Plaintiff, referencing deficiencies in the physician certification form that Scott had received for Plaintiff's knee injury. (Doc. 16-2 at 23). In particular, Scott noted that the form she received (*see id.* at 24), which was completed by an office manager instead of a physician, did not include a return-to-work date and that the Board wanted a form from Plaintiff's orthopedist, Dr. John Featheringill, dated within a week of the accident. (*Id.* at 23). Thereafter, the Board received another physician certification form, this one filled out and signed by Dr. Featheringill on August 22, 2014. (*Id.* at 25). On that form, however, Dr. Featheringill still left the expected return-to-work date blank. (*Id.*) Indeed, he was asked on the form, "Is there a reasonable expectation that the employee should be able to return to work," to which he answered, "no." (*Id.*)

Several days later, Plaintiff began the process of applying for disability retirement with the Retirement Systems of Alabama ("RSA"). Specifically, on August 25, 2014, Plaintiff filled out and signed a "Report of Disability Applicant Authorization" form that granted permission to her long-time personal physician, Dr. Thomas R. Bryant, to release her medical records and information to the RSA. (Doc. 16-2 at 52). Plaintiff indicated on that form that such release was because

she was "applying for ... disability benefits from the [RSA]." (*Id.*) Plaintiff was also seen on that same date, August 25th, by Dr. Bryant. (*Id.* at 50). For several years, he had treated Plaintiff for anxiety and depression, prescribing her a number of medications for those conditions. (*Id.*; Pl. Dep. at 92-93). On that visit to Dr. Bryant, Plaintiff also appears to have supplied him with a form requesting that he provide medical findings and an opinion on her disability retirement claim. (*Id.* at 50-51). The following day, August 26, 2014, Plaintiff went to the Board's central office and completed and signed an RSA "Application for Retirement" form, upon which she indicated she was seeking disability retirement, effective November 1, 2014. (*Id.* at 49). Plaintiff's signature on that document was notarized, also on August 26th, by Kim Scarvey, an employee in the Board's Human Resources department. (*Id.*; Doc. 16-8 at 1-2, Affidavit of Kim Scarvey ("Scarvey Aff.")). That same day, Plaintiff also completed and signed an "Insurance Authorization Form" as part of her disability retirement application paperwork. (Doc. 16-2 at 53).

On September 8, 2014, Plaintiff sent a text message to Cephus advising that she, Plaintiff, could not locate an iPad Mini computer that belonged to the Board. (*See* Doc. 16-2 at 35). Plaintiff explains in her deposition that she borrowed the iPad from a first grade teacher near the end of the 2013-14 school year and took it

home for the summer to download "apps" on it for the teacher's students to use. However, sometime in August 2014 after Plaintiff was injured, she was contacted by the first grade teacher who said she needed the iPad back, but Plaintiff was unable to locate it. (*See* Pl. Dep. at 114-122, 126). In texting Cephus on September 8th, Plaintiff notified her that she had borrowed the iPad and taken it home, but it was now missing and might have been stolen by her estranged husband. (*Id.* at 128-129; Doc. 16-2 at 35). Plaintiff also requested until her next paycheck to purchase a replacement. Ultimately, however, Plaintiff never found the iPad nor paid for another one. (Pl. Dep. at 203). Nevertheless, Plaintiff claims that neither Cephus nor anyone else from her school or the Board ever mentioned the missing iPad to her again.[5] (Pl. Dep. at 130-32, 203).

On September 10, 2014, Gary Evans, the Board's Assistant Director of Human Resources, visited Plaintiff at home. (Pl. Dep. at 79-80, 108-09; Doc. 16-

---

[5]The court notes that the record includes a copy of a letter from Cephus to Plaintiff that does directly discuss the iPad. (Doc. 16-2 at 36). That letter, which is dated September 9, 2014, the day after Plaintiff's text message to Cephus, states as follows:

> I am writing in response to your mobile text message sent to my phone on Monday evening stating that you could not find the iPad that you borrowed from a first grade teacher last year. You asked if you could have more time to look for it and pay for it.
>
> Unfortunately, neither request is an option at this time. You did not have prior approval nor was there a job related purpose for you to take the iPad off campus. I will forward this information to the [Board] to decide upon a course of action.

(*Id.*) Plaintiff insists, however, that she never received that letter. (Pl. Dep. at 130-31).

4, Deposition of Gary Evans ("Evans Dep.") at 9-10). It is undisputed that, on that occasion, Evans told Plaintiff that the Board needed additional paperwork on her medical condition and status in order for her to remain on leave and keep in-pay status. (Pl. Dep. 79-80, 108-109, 132, 137, 147; Evans Dep. at 14-16). Evans also delivered a letter to Plaintiff from Brett Kirkham, the Board's Director of Human Resources, which stated as follows:

> This letter is to inform you that your on-the-job injury information is not up-to-date. As of today, September 10, 2014, we have not received any additional documentation from your physician regarding your August 8, 2014 injury at Minor Community School; however, you still remain off work. As a result, we are unable to provide the appropriate departments the information to correctly process payroll and benefits information. Please forward any new documentation to Ms. Trish Linley, our new On-the-Job Injury Coordinator in our Human Resources Department. If this documentation is not received by Friday, September 12, 2014 we will begin the termination process.

> Thank you for your service to the Board. If I may be of any other assistance, please do not hesitate to contact my office.

(Doc. 16-2 at 48; *see also* Pl. Dep. at 134, 147; Evans Dep. at 10, 15-17). It is undisputed that, in response to Evans's visit, Plaintiff immediately supplied the Board with additional documentation, and she remained on paid, on-the-job-injury leave. (Pl. Dep. at 137, 152).

According to Plaintiff, however, when Evans visited her on September 10th, he also gave her an "ultimatum" (Pl. Dep. at 230) whereby he threatened in no uncertain terms that the Board was going to fire her unless she applied for disability retirement. (*Id.* at 133, 135, 151, 230-31). To that end, Plaintiff says that Evans allegedly told her that "Jefferson County [Schools were] doing [job] cuts" (*id.* at 151) and that Dr. Craig Pouncey, the then-recently-appointed Jefferson County Schools Superintendent, told "them to get rid of the on-the-job injury people first, then the people that could retire" and "then they are going to do ... layoffs." (*Id.* at 148-49). Plaintiff says that Evans also told her that she "needed to fill out the disability retirement papers and get them in as soon as [she] could." (*Id.* at 135)[6].

On September 25, 2014, Dr. Bryant filled out and signed the form that Plaintiff had apparently given to him during her office visit on August 25, 2014,

---

[6]For his part, Evans denies telling Plaintiff that she had to or should retire, on disability or otherwise, in order to avoid getting fired. (Evans Dep. at 25-27, *see also id.* at 31-32). Evans does admit he told Plaintiff when he saw her on September 10th that she could be terminated (*id.* at 22); that he asked her how many years she had been in the school system (*id.* at 24-25); and that he suggested she might contact her union representative and talk with Kim Scarvey, the Board human resources employee who handled leave and retirement matters. (*Id.* at 24-25). However, Evans maintains that he raised those issues only because he had advised Plaintiff that she was facing possible termination as discipline for taking the iPad home and losing it. (*Id.* at 19-22, 24-25, 39). Plaintiff, on the other hand, denies that Evans said anything about the iPad on September 10th or otherwise. (Pl. Dep. at 132, 134). While the testimony of Evans and Plaintiff diverges sharply on these events, the court is, of course, generally bound to credit the latter's version at summary judgment.

which requested information in connection with Plaintiff's application for disability retirement. (Doc. 16-2 at 50-51). On that form, Dr. Bryant opined that Plaintiff was "totally incapacitated for further performance of ... her duty" due to "chronic depression," "acute exacerbation," and "suicidal tendency." (*Id.*) He also stated that Plaintiff was "totally restricted" as to work functions and that there were no "reasonable accommodations that could be made ... to allow [her] to continue ... her employment." (*Id.* at 51). However, when asked whether Plaintiff's "disability [is] permanent," Dr. Bryant wrote, "Not sure." (*Id.* at 50).

On September 30, 2014, Plaintiff came to the Board's central office and met with Trish Linley, an employee in the Human Resources Department. (Doc. 16-9, Affidavit of Trish Linley ("Linley Aff."), ¶¶ 1-2). According to Linley, she assisted Plaintiff in completing her application for disability retirement, explained Plaintiff's final payroll deduction to her, and signed the application form as the employer representative. (*Id.* ¶ 2; *see also* Doc. 16-2 at 49). In the presence of both Linley and Tracee Binion, Plaintiff's union representative, Plaintiff also signed a letter giving formal notice to the Board that she was retiring, effective the next day, October 1, 2014. (*Id.* ¶ 3; Doc. 16-9 at 3). Linley then forwarded Plaintiff's disability retirement application documents to the RSA. (Linley Aff. ¶ 5).

On October 2, 2014, the RSA sent a letter to Plaintiff stating that Dr. Bryant's examining physician statement was insufficient to establish her claim for disability retirement. (Doc. 16-2 at 55). The letter explained that, while an employee is eligible for disability retirement if they cannot perform their job because of a permanent condition, Dr. Bryant had said he is "not sure" whether Plaintiff is permanently disabled. (*Id.*) As a result, the RSA advised, Plaintiff would need to obtain another statement from Dr. Bryant or another physician who could verify that she was permanently disabled. (*Id.*; *see also* Pl. Dep. at 170-171). Meanwhile, although Plaintiff's retirement was originally to be effective October 1, 2014 (*see* Doc. 16-2 at 54, 61), the Board extended her retirement date to November 1, 2014, which allowed her to keep her in-pay status and insurance while she attempted to furnish another physician statement in support of her claim for disability retirement. (Pl. Dep. at 176-78, 190-91, 213, 222, 233, 245-46; Doc. 16-3 at 7).

On or about October 10, 2014, Plaintiff submitted another disability retirement application. (Doc. 16-2 at 56-60; *see also* Pl. Dep. at 172-175). All of that paperwork appears to be comprised of the same application documents she had furnished previously, but with an amended physician statement from Dr. Bryant. (Compare Doc. 16-2 at 49-53 with Doc. 16-2 at 56-60). And in point of

fact, Dr. Bryant's amended statement (*id.* at 58-59) was but a copy of his prior one with one change: when asked on the form whether be believed Plaintiff's disability was permanent, where Dr. Bryant had originally written, "Not sure," he struck through that answer and wrote next to it, "Yes," along with his initials and a date, "10/10/14." (*Id.* at 58).

On December 4, 2014, the RSA sent Plaintiff a letter denying her application for disability retirement. (Doc. 16-2 at 62). The RSA explained that its Medical Board had concluded that the information contained in Dr. Bryant's physician report of disability was insufficient to justify the approval of Plaintiff's claim. (*Id.*) The next day, December 5, 2014, Plaintiff met with Scarvey at the Board's central office. (Scarvey Aff. ¶ 9; Pl. Dep. at 183). At that time, Plaintiff completed and signed a form, again notarized by Scarvey, by which Plaintiff requested a lump sum payment of her employee retirement account. (Doc. 16-2 at 64-65). Scarvey forwarded that form to the RSA on December 10, 2014. (Scarvey Aff. ¶ 12). On December 15, 2014, the RSA responded with another letter to Plaintiff. (Doc. 16-3 at 8-10). In it, the RSA acknowledged receipt of Plaintiff's request for a lump sum payment of her retirement account, but the RSA advised that, because Plaintiff had more than 10 years of service, she was a vested employee, so she had to sign an additional, enclosed withdrawal form. (*Id.* at 8).

That letter also cautioned Plaintiff that, if she took a lump sum, she would be forfeiting her right to receive monthly retirement benefits and insurance coverage for which she would otherwise be eligible starting at age 60 and that her decision would be "irrevocable" once the funds were withdrawn from her account. (*Id.* at 8-9). Plaintiff reviewed the letter and returned the form confirming that she wanted a lump sum payment, which she subsequently received. (Pl. Dep. at 193, 225-26, 229).

Meanwhile, on November 13, 2014, the Board had hired Rebecca Muncher as the Office Coordinator at Minor Community School, the position previously held by Plaintiff. (Pouncey Aff. ¶ 5). On March 26, 2015, the Board implemented a "Financial Improvement Plan," part of which involved a reduction in force ("RIF"), to take effect July 1, 2015. (*Id.* ¶ 6). Muncher was given notice that she was to be laid off as part of that RIF. (*Id.*) In May 2015, however, the Board adopted a revised Financial Improvement Plan, under which the Board rescinded the proposed RIF as it would apply to elementary school Office Coordinators. (*Id.* ¶ 7). As a result, the Board notified employees who were Office Coordinators on March 26, 2015, including Muncher, that they would continue to be employed in their positions. (*Id.* ¶ 8). Although Plaintiff admitted that the Board's proposed RIF occurred only "after [she] was gone" (Pl. Dep. at 200), she called the Board

and spoke to Kirkham and Evans in or about July 2015, and asked for her job

back.  (*Id.* at 204).  That request was denied.

On August 6, 2015, Plaintiff, acting through counsel, commenced this

action by filing a complaint in the Circuit Court of Jefferson County, Alabama.

(Doc. 1-1 at 1-6).  In that pleading, Plaintiff asserted claims against the Board

under the FMLA and Alabama state law.  (*Id.*)  The Board removed the action to

this court, *see* 28 U.S.C. §§ 1441, 1446, invoking its federal-question jurisdiction,

*see* 28 U.S.C. § 1331, based on the FMLA claims.  (Doc. 1).  In her now-

governing Amended Complaint (Doc. 11-1)[7], Plaintiff asserts claims against the

Board pursuant to the FMLA for unlawful interference, unlawful retaliation (Amd.

Compl. ¶¶ 22-30) and failure to provide notice of FMLA rights.  (*Id.* ¶¶ 31-39).

Plaintiff also asserts a claim under Alabama state law for the tort of "outrage."

(*Id.* ¶¶ 40-43).

Discovery being complete, the Board has moved for summary judgment.

(Doc. 14).  The parties have filed evidentiary submissions (Docs. 16, 20) in

support of their respective positions on that motion, which has been fully briefed.

(Docs. 15, 19, 21).  In addition, the Board has filed a motion asking the court to

strike or to otherwise decline to consider respective declarations by Plaintiff (Doc.

---

[7]*See* note 2.

20-1 (Pl. Decl.)) and Shelly Brown (Doc. 20-2, Declaration of Shelly Brown

("Brown Decl.")), Plaintiff's former co-worker who would testify on her behalf.

(Doc. 22).  The Board argues that those declarations are due to be disregarded

because they allegedly contradict Plaintiff's prior deposition testimony.  (*Id.*)

## III.  DISCUSSION

### A.    FMLA Claims

The FMLA's central provision guarantees an eligible[8] employee 12 weeks

of unpaid leave in a one-year period because of "a serious health condition that

makes the employee unable to perform the functions of the position of such

employee," 29 U.S.C. § 2612(a)(1)(D).  *See also Ragsdale v. Wolverine World*

*Wide, Inc.*, 535 U.S. 81, 86-87 (2002); *Cooper v. Fulton County, Ga.*, 458 F.3d

1282, 1285 (11th Cir. 2006); *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379,

1382 (11th Cir. 2005).  The FMLA also entitles an eligible employee who takes

protected leave to be restored to his or her former position or an equivalent

---

[8]To be eligible for FMLA protection, an employee must have, among other things, worked 1250 hours in the preceding 12 months.  29 U.S.C. § 2611(2)(A)(ii); *see also Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1272 (11th Cir. 2012).  The Board makes a threshold argument that Plaintiff did not do so, thereby defeating all of her FMLA claims. However, the court concludes that the Board is entitled to summary judgment even if it is assumed that Plaintiff worked the requisite number of hours.  That also moots the Board's motion to strike the respective declarations of Plaintiff and Shelley Brown (Doc. 22), both of which concern only whether Plaintiff worked enough hours to be eligible for FMLA protection.

position. 29 U.S.C. § 2614(a). *See also Ragsdale*, 535 U.S. at 86; *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001); The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of" substantive rights. 29 U.S.C. § 2615(a)(1), and violators are subject to consequential damages and appropriate equitable relief. 29 U.S.C. § 2617(a)(1). "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland*, 239 F.3d at 1206 (internal citations omitted); *see also* 29 U.S.C. § 2615(a); *Hurlbert v. St. Mary's Health Care Syst., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). Plaintiff is pursuing both types of claims. The court first considers those asserting unlawful interference.

### 1. FMLA Interference

To make out a claim of interference with a substantive right under the FMLA, an employee must demonstrate that she was entitled to a benefit that was denied by the employer. *Drago v. Jenne*, 453 F.3d 1301, 1306 (11th Cir. 2006); *O'Connor v. PCA Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000).

The employee need not show that his employer affirmatively intended to deny a protected benefit, for the employer's motives in doing so are irrelevant. *Hurlbert*, 439 F.3d at 1293. In other words, "a causal nexus is not an element of an interference claim." *Spakes v. Broward County Sheriff's Office*, 631 F.3d 1307, 1309 (11th Cir. 2011).

### a.    The Right to Take Protected Leave

Plaintiff claims that the Board interfered with her right to take FMLA leave based on a theory that her medical leave for her on-the-job injury was protected under the Act and "was cut short because she was fired." (Doc. 19 at 5). In that vein, Plaintiff repeatedly takes it for granted in her summary judgment brief that the Board terminated her employment. However, as further explored later, it is undisputed the Board did not actually discharge Plaintiff; rather, she formally *retired*. (*See* Doc. 16-2 at 54; *see also* Amd. Compl. ¶¶ 23, 24). And if she retired voluntarily, Plaintiff cannot prevail on an interference claim premised on an alleged denial of leave thereafter. *See Paasch v. City of Safety Harbor*, 915 F. Supp. 315, 322 (M.D. Fla. 1995) (holding that any request by the employee for FMLA leave was terminated by the employee's voluntary resignation), *aff'd*, 78 F.3d 600 (11th Cir. 1996) (table). Plaintiff insists, though, that her decision to retire was coerced by Evans, who allegedly threatened that the Board was going to

terminate her. (*See* Doc. 19 at 16). Plaintiff thus takes the position that her retirement was involuntary and amounted to a constructive discharge that interfered with her right to take FMLA leave. (Amd. Compl. ¶ 28).

The Board argues, however, that, irrespective of how one might legally characterize the separation of Plaintiff from her employment, she cannot establish interference with her right to take FMLA leave because the record establishes that she received all of the leave to which she might have been entitled under the Act. The court agrees. Under the FMLA, an employee has a right to take up to 12 weeks of unpaid medical leave. 29 U.S.C. § 2612(a). The record shows that Plaintiff not only got that much leave, she was also paid for all of it: Plaintiff was injured on the morning of August 8, 2014, and never returned to her job duties thereafter. It is undisputed that she was on paid, "on-the-job-injury" leave from the date of her accident until her retirement took effect on November 1, 2014. During that period, Plaintiff took the position that she was not able to work, as did her personal physician, Dr. Bryant. And that period encompassed twelve workweeks, commencing each Monday from August 11, 2014, through October 27, 2014.[9] Under the Board's written policies, such paid, on-the-job-injury leave

---

[9]Specifically, the 12 workweeks are those beginning on August 11, 18, and 25; September 1, 8, 15, 22, and 29; and October 6, 13, 20, and 27, 2014. The court notes that those weeks included two holidays: Labor Day (Monday, September 1, 2014) and Columbus Day (Monday, October 13, 2014). However, "for purposes of determining the amount of leave used by an employee, the

18

ran concurrently with unpaid medical leave to which Plaintiff might have been entitled under the FMLA. Accordingly, even assuming *arguendo* that the Board constructively terminated Plaintiff as of November 1, 2014, the date through which she admits she was paid and retained her insurance and other benefits, she had by that point received 12 weeks of leave, so her FMLA interference claim regarding a denial of leave is not viable. *See Dixon v. Public Health Trust of Dade Cty.*, 567 F. App'x 822, 825-26 (11th Cir. 2014) (recognizing that the plaintiff's claim alleging that she was terminated before she completed her FMLA leave was not viable "if [she] was terminated after she received twelve weeks of leave – be it paid or unpaid, personal or family, vacation or medical" (citing *Ragsdale*, 535 U.S. at 96; *McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999)); *cf. Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1275 (11th Cir. 1999) ("[A] plaintiff suffers no FMLA injury when she receives all the leave she requests, and indeed is paid for most of it."). Plaintiff has offered no evidence or specific argument to dispute that result.

### b. Right to Restoration to Former Position

Although Plaintiff's pleading is not a model of clarity, it seems she may also be claiming that, by constructively discharging her, the Board interfered with her

---

fact that a holiday may occur within the week taken as FMLA leave has no effect; the week is counted as a week of FMLA leave." 29 C.F.R. § 825.200(h).

right under 29 U.S.C. § 2614(a) to be restored to her former position.  It is at least

fair to say that the Board interprets Plaintiff's complaint as encompassing such an

interference claim (*see* Doc. 15 at 26-29), so the court will too.  However, as

discussed above, the Board has argued that Plaintiff cannot establish an FMLA

injury because she received all of the leave to which she was entitled and remained

unable to work thereafter.  The court agrees.

Once Plaintiff exhausted her 12 weeks of leave and she, along with her

physician, Dr. Bryant, asserted that she was still unable to work, Plaintiff's right

under the FMLA to be restored to her former position evaporated.  *See* 29 C.F.R. §

825.216(c) ("If the employee is unable to perform an essential function of the

position because of a physical or mental condition, ... the employee has no right to

restoration to another position under the FMLA."); *Dixon*, 567 F. App'x at 825-26

(recognizing that the plaintiff's FMLA claim alleging that the employer failed to

restore her to her former position was not viable if she "was terminated after she

received twelve weeks of leave—be it paid or unpaid, personal or family, vacation

or medical"); *Freeman v. Koch Foods of Ala.*, 777 F. Supp. 2d 1264, 1289 (M.D.

Ala. 2011) ("[T]he right to reinstatement terminated once the twelve weeks of

FMLA leave are finished."); *Cox v. Autozone, Inc.*, 990 F. Supp. 1369, 1377–79

(M.D. Ala. 1998) ("Under the FMLA, an eligible employee receives twelve weeks

of unpaid leave in any twelve month period for certain family and medical purposes without risking his or her job.... An employer has no responsibility to restore a person's job after that twelve week period."), *aff'd sub nom. McGregor v. Autozone, Inc.*, 180 F.3d 1305 (11th Cir. 1999). Accordingly, the Board is entitled to summary judgment on this claim on that basis alone.

Even assuming *arguendo* that Plaintiff might have enjoyed a right under the FMLA to be restored to her former position upon the conclusion of her 12 weeks of leave, the court also agrees with the Board that any associated interference claim fails because the evidence shows without genuine dispute that Plaintiff retired voluntarily and was not constructively discharged. Again, there is no question that, formally speaking, Plaintiff retired. (*See* Doc. 16-2 at 54; *see also* Amd. Compl. ¶ 23 ("[Plaintiff] resigned, applied for [disability retirement] and did not get it, and lost her job and all income.")). That decision is presumed to have been voluntary. *See Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (stating that "employee resignations are presumed to be voluntary"). And if it was, Plaintiff will not be heard to complain that the Board failed to restore her to her former position. *See* 29 C.F.R. § 825.311(b) ("If an employee gives unequivocal notice of intent not to return to work, the employer's obligation[ ] under FMLA ... to restore the employee cease[s]."); *Walthall v. Fulton Cty. Sch.*

21

*Dist.*, 18 F. Supp. 2d 1378, 1384 (N.D. Ga. 1998) (holding that the plaintiff's resignation "terminated any obligation of the part of the Defendants to restore her to her former position"), *aff'd*, 192 F.3d 131 (11th Cir. 1999) (table).

Plaintiff argues, however, that she was forced into early retirement and thereby constructively discharged. Under the constructive discharge doctrine, courts treat an employee's resignation as though the employer actually fired her when the employee is faced with circumstances of discrimination so intolerable that a reasonable person would resign. *Green v. Brennan*, ___ U.S. ___, ___, 136 S. Ct. 1769, 1779 (2016); *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141-43 (2004); *see also Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) ("Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." (quoting *Munday v. Waste Mgmt. of N. Amer., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997)); *Hargray*, 57 F.3d at 1567-68 (recognizing in the context of a due process claim brought pursuant to 42 U.S.C. § 1983 that an employee's "resignation [may be] so involuntary that it amounted to a constructive discharge ... where the employer forces the resignation by coercion or duress"). The doctrine certainly may apply in the FMLA context. *See Graham*, 193 F.3d at 1284. Accordingly, "[i]n order to show constructive discharge, ... the plaintiff must show that the

situation was so intolerable that [s]he had no choice but to take early retirement."
*Rowell v. BellSouth Corp.*, 433 F.3d 794, 806 (11th Cir. 2005) (internal quotation marks omitted).

Plaintiff argues that she was constructively discharged in that she only agreed to retire, she says, because Evans told her that she would otherwise be terminated, in that the Board and the Superintendent were purportedly looking to "get rid" of employees who were on injury leave, like her. To that end, the Eleventh Circuit has recognized that a constructive discharge may occur when the employer presents an offer that is merely, "at rock bottom, a choice between early retirement with benefits or discharge without benefits, or, more starkly still, an impermissible take-it-or-leave it choice between retirement or discharge." *Rowell*, 433 F.3d at 806 (quoting *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir. 1993) (emphasis added in *Rowell* omitted); *see also Downey v. Southern Nat. Gas Co.*, 649 F.2d 302, 305 (5th Cir. Unit B June 1981)[10] (holding that a jury question was presented on age-discrimination claim alleging constructive discharge where employee took early retirement because he had been told by the employer's personnel director that he was in danger of being discharged, and thus

---

[10]Decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

of losing his stock benefits, because the company did not want to keep him around until the mandatory retirement age of 70).

However, that an employee is threatened with termination is not itself enough to establish a constructive discharge. *See Hargray*, 57 F.3d at 1568; *cf. Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (holding that a threat of termination was not itself a tangible or materially adverse job action capable of supporting an employment discrimination claim under federal law). That is so because the "fact that one of the possible outcomes is that [the plaintiff] would lose his job alone is not sufficient to establish the intolerable conditions sufficient to justify a finding of constructive discharge because the possibility that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired.' " *Rowell*, 433 F.3d at 806. For example, a decision to resign is deemed voluntary where it is made in the face of a threat of termination for cause, based on the employer's good-faith belief that the employee engaged in misconduct.[11] *See Hargray*, 57 F.3d at 1568; *see also Van*

---

[11]Accordingly, insofar as Plaintiff might have retired because she thought she might be fired for losing the iPad and she wanted to avoid a forfeiture of insurance or retirement benefits that would have come with a termination, her decision to retire would not have been made under duress. However, given that Plaintiff has testified that no one with the Board or her school ever threatened her with discipline over the iPad, the court will assume for present purposes that Plaintiff's decision to retire was not influenced by such concerns, as she claims.

The Board also demands summary judgment on the theory that, even if Plaintiff had not retired, the "Board had valid ground to terminate [her] for taking the iPad." (Doc. 15 at 30). To

*Arsdel v. Texas A&M Univ.*, 628 F.2d 344, 345-46 (5th Cir. 1980) (holding that

"duress was absent as a matter of law" where employee "made a reasoned choice"

to resign "to obviate the embarrassment that a public, detailed dismissal

proceeding [to consider a charge that he sexually harassed a co-worker] would

bring"). Also, even if an employee is told he might be terminated in a pending

RIF, if he accepts a severance package rather than waiting to see if he can remain

employed, he cannot claim that he was constructively discharged. *Rowell*, 433

F.3d at 806.

---

be sure, the FMLA does not insulate an employee against being terminated for misconduct unrelated to protected leave. *Gamba v. City of Sunrise*, 157 F. App'x 112, 113 (11th Cir. 2005); *Dark v. Learning Tree, Inc.*, 1:13-cv-00584-JEO, 2015 WL 1865432, at *19 (N.D. Ala. Apr. 23, 2015). Thus, even if an employee is terminated and thereby denied rights protected by the FMLA, the employer is not liable for unlawful interference if it can establish, as an affirmative defense, that it dismissed the plaintiff for reasons unrelated to leave. *See Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 831 (11th Cir. 2015); *Spakes v. Broward Cty. Sheriff's Office*, 631 F.3d 1307, 1310 (11th Cir. 2011); *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235-36 (11th Cir. 2010). However, even if the Board has shown it "would have been authorized" or "had valid grounds" for discharging Plaintiff over the missing iPad (Doc. 15 at 30), that would support only that the Board "could have" legally fired her on that basis, not that the Board actually "did" so or even that it "would have" if given the chance. *Cf. Smith v. Department of Labor*, ___ F. App'x ___, ___, 2017 WL 75763, at *5 (4th Cir. Jan. 9, 2017) ("The 'same action' or 'same decision' affirmative defense requires the employer to prove that it "would have," not simply that it "could have," made the same adverse employment decision absent the protected activity."); *Reed v. AMAX Coal Co.*, 971 F.2d 1295, 1298 (7th Cir. 1992) (requiring "proof that the employer would have fired the employee, not simply that it could have fired him"); *Foster v. University of Ark.*, 938 F.2d 111, 114 (8th Cir. 1991) (" '[C]ould have been fired' is not the same as 'would have been fired'; in other words, even if the same decision would have been justified if the plaintiff were white, that does not necessarily mean that the same decision would have been made."). Further, to prevail at summary judgment based on an affirmative defense, a defendant must establish the defense *as a matter of law, i.e.*, a reasonable jury could conclude nothing other than that the defense applies. *See Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590-92, 597 (11th Cir. 1994); *see also* 10B C. Wright, A. Miller, et al., *Fed. Prac. & Proc.* § 2734 (4th ed.). The Board has not met that demanding burden.

The real problem here for Plaintiff, though, is one of causation. For an employee's resignation to constitute a constructive discharge, there must be a causal nexus between the employer's harassing or otherwise unlawful conduct and the employee's decision to resign. *See Henson v. City of Dundee*, 682 F.2d 897, 907-08 (11th Cir. 1982); *Keller v. City of Tallahassee*, 181 F. Supp. 3d 934, 944–45 (N.D. Fla. 2015). To that end, Plaintiff claims that she retired only because Evans told her that she would be fired unless she applied for disability retirement. Indeed, Plaintiff expressly insists that, until that discussion with Evans, she had "every intention" of returning to work and had not filled out disability retirement forms. (Pl. Dep. at 151-52, 154).

Plaintiff clearly claims, however, that Evans made the threat of termination when he visited her at home on September 10, 2014. (Pl. Dep. at 108-09, 132-35, 148-49, 229-30). Notwithstanding, the record contains an affidavit from Scarvey and documentary evidence showing that Plaintiff had completed, signed, and dated the various forms required to apply for disability retirement on August 25 and 26, 2014 (Doc. 16-2 at 49-53; Scarvey Aff. ¶ 4), two weeks *before* Plaintiff says Evans delivered his ultimatum. It is obviously impossible for Plaintiff to have filled out the forms for disability retirement on August 25th and 26th because of anything that Evans supposedly said to her on September 10th. Plaintiff testified

in her deposition that she does not remember filling out those disability retirement application documents in August 2014. (Pl. Dep. at 153-54, 156-57). However, she admits that she evidently did complete and sign them. (*Id.* at 154-55, 160-64, 247). And by the end of her deposition, she essentially conceded that she "was so confused" (*id.* at 231) that she was no longer sure what documents she had filled out or when. (*See id.* at 230-31, 234-35, 247, 249-51). The court is, of course, generally required at summary judgment to credit the testimony of the non-movant. However, that Plaintiff says she is unable to recall when she first filled out the application paperwork for disability retirement is insufficient to contradict the testimony of Scarvey and the documents themselves showing that Plaintiff completed them on August 25th and 26th, 2014, two weeks before her meeting with Evans. *See Wellons, Inc. v. Lexington Ins. Co.*, 566 F. App'x 813, 819 n. 4 (11th Cir. 2014); *Torres-Sanchez v. Jefferson Cty. Bd. of Health*, 2017 WL 1247496, at *7 n. 12 (N.D. Ala. Apr. 5, 2017); *Byrd v. Dollar Gen. Corp.*, 2000 WL 360239, at *2 (S.D. Ala. Mar. 27, 2000). Accordingly, Board is also entitled to summary judgment on any claim asserting interference with her right to be restored to her former position on the alternative basis that Plaintiff cannot show that her decision to retire amounted to a constructive discharge.

27

### c.  Failure to Give Notice of FMLA Rights

Plaintiff also claims that the Board is liable for allegedly failing to provide her with notice of her FMLA rights.  In particular, Plaintiff complains that the Board failed to make clear, or otherwise misled her about, whether her paid, on-the-job-injury leave was or could have been protected under the FMLA.  Plaintiff seems to conceive of that claim, which she pleads in a separate count, as a freestanding one under the FMLA.  (*See* Doc. 11-1, ¶¶ 31-39; Doc. 19 at 17).  However, such a claim is actually but a species of interference claim.  That is, an employee may demonstrate that the employer's failure to comply with its notice obligations under the FMLA effectively interfered with the employee's ability to exercise substantive rights.  *See Willmore-Cochran v. Wal-Mart Associates, Inc.*, 919 F. Supp. 2d 1222, 1243 (N.D. Ala. 2013).

Even so, the FMLA's private enforcement statute, 29 U.S.C. § 2617, "provides no relief unless the employee has been prejudiced by [the employer's] violation" of the Act.  *Ragsdale*, 535 U.S. at 89.  Thus, even if the employer has "committed certain technical infractions under the FMLA, plaintiff may not recover in the absence of damages."  *Graham*, 193 F.3d at 1284; *see also, e.g.*, *Simmons v. Indian Rivers Mental Health Ctr.*, 652 F. App'x 809, 820 (11th Cir. 2016) (holding that even if the employer misinformed the employee about her

28

FMLA rights, the employee was not entitled to recover where her entire leave request was approved retroactively to the first day she was on medical leave and she was not required to perform any work during such leave).  And since Plaintiff cannot show that the Board interfered with any of her FMLA rights, for reasons explained above, she cannot show prejudice from any purported violation by the Board with regard to its notice obligations.  Accordingly, Plaintiff's "notice claim under [the] FMLA" (Doc. 11-1 at 8) is due to be dismissed.

### 2.    FMLA Retaliation

Plaintiff also contends that the Board unlawfully retaliated against her in violation of the FMLA.  In particular, Plaintiff claims that the Board retaliated against her for taking FMLA leave by refusing her request, in or about July 2015, to be reinstated to her previous position after the Board allegedly recalled or retained certain employees in connection with a layoff.  (Amd. Compl. ¶¶ 27-30). The FMLA prohibits an employer from refusing to rehire a former employee in retaliation for having taken protected medical leave.  *Smith v. BellSouth Telecomm., Inc.*, 273 F.3d 1303, 1313-14 (11th Cir. 2001).

To succeed on this claim, Plaintiff "must demonstrate that [the Board] 'intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right.' "  *Jones v. Gulf Coast Health Care of*

*Del., LLC*, ___ F.3d ___, ___, 2017 WL 1396165, at *5 (11th Cir. April 19, 2017)

(quoting *Strickland*, 239 F.3d at 1207). "In other words, [Plaintiff] must show

"that [her] employer's actions 'were motivated by an impermissible retaliatory or

discriminatory animus.' " *Id.* (quoting Strickland, supra (further citation

omitted)).

The crux of Plaintiff's retaliation claim is that the Board should have

returned her to her former position as the Office Coordinator at Minor Community

School because the Board had recalled or otherwise allowed Office Coordinators

to remain employed instead of being laid off as part of a planned RIF. However,

Plaintiff had retired effective November 1, 2014. That was several months before

the RIF was even first proposed in March 2015 and when the RIF plan was

modified in May 2015 to allow Office Coordinators employed as of March 26,

2015, to remain employed. Rather, the Board had hired Rebecca Muncher to

replace Plaintiff as the Office Coordinator at Minor Community School on

November 13, 2014, so it was Muncher that was retained under the modified RIF

plan. In short, it is undisputed that Plaintiff had retired, that her former position

was no longer vacant, and that she was never part of the RIF nor was subject to

any modification by which Office Coordinators were permitted to stay in their

jobs. Accordingly, Plaintiff cannot show that the Board's failure to put her back

into her previous position amounted to unlawful retaliation for having taken protected FMLA leave. This claim is due to be dismissed.

### B. Alabama State Law Claim for "Outrage"

Plaintiff also asserts a claim under Alabama state law for the tort of "outrage." (Amd. Compl. ¶¶ 40-43). Such a claim is also known as intentional infliction of emotional distress. *See Ex Parte Lumbermen's Underwriting Alliance*, 662 So.2d 1133, 1134 (Ala. 1995); *Peterson v. BMI Refractories*, 132 F.3d 1405, 1413 (11th Cir. 1998). As the Board argues, however, county boards of education are entitled to sovereign immunity under Alabama law as to such state-law claims. *See Barnett v. Baldwin Cty. Bd. of Educ.*, 60 F. Supp. 3d 1216, 1238 (S.D. Ala. 2014); *see also Ex parte Jackson Cty. Bd. of Educ.*, 164 So. 3d 532, 534-36 (Ala. 2014); *Ex parte Hale Cty. Bd. of Educ,,* 14 So. 3d 844, 849 (Ala. 2009),*Walker v. Jefferson Cty. Bd. of Educ.*, 771 F.3d 748, 753-54 (11th Cir. 2014). Thus, the Board's motion for summary judgment is due to be granted as to this claim as well.

### IV.    CONCLUSION

Based on the foregoing, the Board's motion for summary judgment (Doc. 14) is due to be **GRANTED**. The Board's motion to strike the respective

declarations of Plaintiff and Shelly Brown (Doc. 22) is **MOOT**.  A separate final order will be entered.

    **DONE**, this 5th day of May, 2017.

                                _____
                                **JOHN E. OTT**
                                Chief United States Magistrate Judge